IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| YORAM RAZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05-CV-433-JHP-FHM |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant, ) | |

## **ORDER**

The instant case was dismissed by the Court on April 7, 2006. Thereafter, the April 7, 2006, Order was vacated and the case was remanded by the Tenth Circuit Court of Appeals, Case No. 06-5101. The mandate directed this Court to set forth reasons to support its dismissal.

Now before the Court is the Defendant's Motion to Dismiss (Dkt.# 4), Plaintiff's Response and Defendant's Reply. Additionally, Plaintiff filed a Supplement to the Motion to Dismiss (Dkt.# 16). Defendant moves to dismiss Plaintiff's Complaint on several grounds, including the principles of res judicata and collateral estoppel. Specifically, Defendant argues Plaintiff's claims are precluded because they have been fully addressed and litigated in two cases filed in the Western District of Arkansas. The Arkansas cases were consolidated for non-jury trial which was conducted from July 18 to July 21, 2005. Although at the time this case was filed the Arkansas Court had not yet made a ruling, Judge Jimm Larry Hendren did enter a forty-eight (48) page Memorandum Opinion and Order denying all Plaintiff's claims on September 2, 2005.

1

**BACKGROUND**

This is the latest in a long series of actions which the plaintiff, Yoram Raz, has brought in various federal courts against state and federal law enforcement officials, including agents of the Federal Bureau of Investigation("FBI").[1] In each of these cases, Plaintiff has alleged, unsuccessfully, that he has been subjected to illegal, relentless, and tortious surveillance by those officials, because of his past political activities in his homeland.

Plaintiff has filed the instant case under the Federal Tort Claims Act, 28 U.S.C. §1346, 2671 et seq. ("FTCA"). Plaintiff contends he filed an administrative claim on November 29, 2004, which he amended on January 25, 2005. These claims were denied on January 31, 2005.

Generally, Plaintiff claims an incident occurred on October 2, 2004, which was "but one more incident in a long campaign of FBI Surveillance, Investigations, Sting-Operations and Harassment against Plaintiff and that groundless campaign of hostilities against peaceful and law-abiding Plaintiff should be sanctioned!" (Complaint at par. 9.10). Plaintiff alleges the FBI has enlisted local law enforcement in its campaign against him during the past eighteen years. (Complaint at par. 6.3). Plaintiff believes he is named on the FBI's Terrorism Watch List. Id.

Specifically, the Complaint in the instant case states Plaintiff installed video cameras and recorders on his car so that he could obtain evidence of the FBI's activities against him.

---

[1] Plaintiff filed five cases in the United States District Court for the Western District of Louisiana: Raz v. United States, Case No. CV99-202-S; Raz v. Storey, Case No. CV99-1850-S; Raz v. Louisiana State University Medical Center Shreveport, Case No. CV01-381-S; Raz v. United States, Case No. CV01-03887-S; and Raz v. United States Marshal Service, Case No. CV01-399-S. Decisions in appeals arising from those cases appear at Raz v. Storey, 34 Fed.Appx. 151 (5th Cir. 2002); In re Raz, 48 Fed. Appx. 104 (5th Cir. 2002); Raz v. Oakes, 48 Fed.Appx. 481 (5th Cir. 2002); and Raz v. Louisiana State University Medical Center Shereveport, 48 Fed.Appx. 481 (5th Cir. 2002). Plaintiff has also filed two lawsuits in the United States District Court for the Western District of Arkansas.

> Plaintiff's bitter experience in failing to
> stop the FBI Surveillance in Federal Courts
> in Louisiana taught him that without hard
> evidence of his own (i.e. video recordings)
> he will not be believed as Federal Judges
> much prefer to believe the mighty FBI than
> the unusual allegations of one unknown pro-
> se individual.

(Complaint at par. 6.4). Plaintiff installed twelve video cameras on the top of his car. Id. at par. 5.1. Four of the cameras were encased in three-inch PVC pipe with glass fronts. Id. The cameras were installed to record the activities of local law enforcement officials as well as FBI activities. Id. at par. 6.3. Plaintiff alleges the FBI surveillance diminished after he filed the Arkansas cases and the local law enforcement surveillance decreased after he installed the cameras on his car. Id. at par. 6.3. Plaintiff further contends the cameras successfully captured instances of FBI surveillance on film. Id. at par. 6.5.

Plaintiff also alleges that during the course of the Arkansas litigation, the FBI learned he had installed the cameras and was taping FBI activities. Id. at par. 7.1. Plaintiff asserts his video recordings were "very embarrassing to FBI because they were instrumental in refuting FBI's official claims that it never had Plaintiff under Surveillance and that all of his allegations, in that respect, are mere delusions of his fertile imagination." Id. at par. 7.3. Plaintiff alleges the FBI attempted to destroy the cameras on several occasions, including one on August 6, 2004, in Siloam Springs, Arkansas. Id. at par. 7.3. The Complaint states that as part of the scheme to discredit him in the eyes of the federal judiciary, the FBI laced its reports and documents with derogatory remarks about him,

> including false and malicious fabrications
> that he is delusional, paranoid and nuts,
> and that a Court of law [unspecified][sic]
> issued against him mental commitment order
> for walking around nude in his yard and
> for erratic behavior – all such outrageous
> and inflammatory allegations are utterly

>false and malicious and represent an
>extreme abuse of Color of Law and Govern-
>ment facilities to unjustifiably discredit
>and gravely harm an individual who was
>merely struggling to free himself from a
>protracted FBI surveillance.

Id. at par. 7.4. As Plaintiff explains, the "shocking FBI documents were submitted in the Arkansas trial "and will be submitted in this case as well." Id. The "false and inflammatory" documents are alleged to have influenced the decision on October 2, 2004, to destroy Plaintiff's car. Id. at par. 7.4, 9.5.

The Complaint recounts events on October 2, 2004, when Plaintiff traveled into Delaware County, Oklahoma, and was stopped by sheriff's deputies as a result of a citizen's report "that a man that looked to him middle-eastern had an unusual contraption on the top of his car that could, in his opinion, be pipe-bombs." Id. at par. 8.1.

Plaintiff alleges that after an examination of the cameras and his papers, the sheriff's deputies "were ready to let him go." Id. at par. 8.2. The FBI then intervened. Id. at par. 8.2, 9.7. According to the Complaint, the FBI directed that he should be detained and "falsely issued a stern warning that Plaintiff was to be considered 'Armed and Dangerous' and 'should be approached with extreme caution' (consequently, Plaintiff was handcuffed, strapped and detained)." Id. The Complaint states Plaintiff was subjected to hours of physical discomfort as a result of his detention. Id. at par. 8.3.

Exhibit 4 attached to the Complaint is a report of the incident by the Delaware County Sheriff's Office. The contents of the report vary from the allegations of the Complaint to which it is attached. For example, in contrast to the perfunctory encounter with deputies which the Complaint describes, the report states that "Deputy Melton advised the driver is being uncooperative and refused to tell him what was in the pipes mounted to the top of his car because it was classified information." (Complaint at Ex. 4). Deputy Eberle advised to contact the FBI. Id. Rather than ordering Plaintiff's detention, the report states that FBI

Special Agent Cindy "Alexander advised that the deputy may want to detain this subject for officer safety. Alexander stated that if the deputy believes this is a possible bomb, he can contact an OHP bomb tech." Id. Later in the report, Alexander states that Plaintiff can be detained for an INS violation. Id. The Oklahoma Highway Patrol ("OHP") did dispatch a bomb technician to the scene. Id. At least one highway appears to have been shut down as a consequence of the situation. Id.

The Complaint alleges the OHP bomb squad arrived at the scene "and under the request of the FBI it detonated the cameras that were installed on the top of Plaintiff's car." (Complaint at par. 8.4). Then, under the "commanding roll [sic]" of the FBI, the car was torn apart in a search for explosives and contraband. Id. at par. 8.5. Plaintiff's videotapes were taken, and later returned. Id.

Plaintiff states the incident was reported by "the Media and Plaintiff was wrongfully depicted as a terrorist threat." Id. at par. 8.8. "Although his name was not released to the press (because no arrest was made) his identity was known in north-west Arkansas since his car was known all around." Id.

According to the Complaint, in 1999 Plaintiff began his litigative efforts to stop the FBI surveillance and harassment by filing federal cases in the Western District of Louisiana. Id. at par. 6.4. Those actions failed to obtain the relief Plaintiff sought and were dismissed. Id.

In September 2002, Plaintiff renewed his efforts to forestall the FBI by filing lawsuits in the Western District of Arkansas. As previously noted, Judge Jimm Hendren entered a Memorandum Opinion and an Order on September 2, 2005.

The Arkansas cases arose from Plaintiff's claim that the FBI had carried out unwarranted surveillance of him spanning many years. (Memorandum Opinion at p. 1). Case number 02-5184 was brought against FBI Director Robert Mueller for injunctive relief and case number 02-5193 was brought against the United States for money damages under the FTCA, alleging torts of invasion of privacy and intentional infliction of emotional

distress. Id. The cases were consolidated for discovery and trial. Id. at 2. Discovery, which lasted from February 2004 to July 2005, was extensive. Id. at 5. The Government filed a motion to bar testimony regarding damages related to the incident on October 2, 2004, but did not obtain a ruling on the motion and never objected to such testimony at trial; therefore, the motion was denied. (Memorandum Opinion at 3).

In his Memorandum Opinion, Judge Hendren made extensive findings of fact concerning Plaintiff's dealings with local law enforcement and the FBI. Judge Hendren noted that some of the evidence offered by Plaintiff related to incidents of alleged surveillance in which Plaintiff could not specify the people or agencies involved. Judge Hendren did "not credit Plaintiff's testimony that any of the people described in such vague terms were agents of, or employees of, or in any way associated with, the FBI." Id. A "much smaller" part of Plaintiff's evidence related to specific people. Judge Hendren reviewed those specific incidents chronologically, beginning in 1987.

The period from 1987 to 1988 involved certain limited activities of law enforcement in Arkansas. In 1992, Plaintiff moved to Louisiana. The Court did not believe that a woman whom Plaintiff dated there was an FBI operative. Although the Bienville Parish Sheriff's Office ("BPSO") received complaints from Plaintiff about harassment he received from unknown persons, and BPSO officers forcibly taking him to an emergency room at Louisiana State University Medical Center, the Court did not agree with Plaintiff that the FBI was involved in those incidents.

After Plaintiff's release from the medical facility, Plaintiff went to the chambers of the Chief Judge of the United States Court of Appeals for the Fifth Circuit in order to show Judge Politz the injuries he had sustained when he was forcibly taken by the BPSO officers.

> The visit to Judge Politz's chambers went predictably awry when Raz began removing his clothing in the presence of the law clerks in order to reveal his injuries. Court security officers were called, and

6

>>Raz was taken to the United States Marshal's Office to be questioned.

Id. The deputy marshals, in speaking with Plaintiff, encouraged him to contact the FBI about the events in Bienville Parish. He did so with some reluctance, and the Court noted that the ensuing investigation by the FBI as to Plaintiff's allegations of wrongs in Bienville Parish was limited. The Court found nothing to indicate intentional misrepresentations in the FBI reports that resulted from Plaintiff's complaints.

The Court noted that Plaintiff had instituted five actions in the United States District Court for the Western District of Louisiana. The Court also discussed Plaintiff's citizenship status. The Memorandum Opinion reviews the few contacts the FBI had with Plaintiff in Louisiana after the terrorist attacks on September 11, 2001.

In 2002, Plaintiff moved from Louisiana to northwest Arkansas. Although he felt he was under constant surveillance until October 2002, he was not able to offer evidence of such surveillance, or who conducted it. Several other contacts with law enforcement are described.

Plaintiff installed the cameras on his car in late 2003. The Memorandum Opinion states, "The device did not look like an assemblage of cameras, however. It looked like some sort of weaponry."

In May 2004, upon receiving a report about the car from a deputy, FBI agents stopped Plaintiff in Fayetteville, Arkansas. Initially, he refused to identify himself. Later, Plaintiff did identify himself but remained unwilling to talk to the agents.

In June 2004, the FBI in New Orleans received a report from a car dealership that someone was driving a car that had a "weird mechanical thing installed on the roof . . .it looked like a rocket launcher," and that Plaintiff repeatedly stated to car dealership employees not to ask him any questions about the object on top of his car. The next day Plaintiff returned to the dealership in a different car that contained a placard that said, "United States Postal Inspector, Official Business," and a box of .32 caliber Smith & Wesson ammunition.

In August 2004, Plaintiff had an encounter with local law enforcement officials in Siloam Springs, Arkansas.

The Memorandum Opinion devotes five paragraphs in the Findings of Fact to the incident of October 2, 2004.

> 63. On October 2, 2004, the Delaware County Sheriff's Office ("DCSO") contacted the Oklahoma FBI office with regard to a 911 call from "a concerned citizen regarding a suspicious Middle Eastern male," who was reported to be driving "a white car with a satellite dish mounted on the roof along with what appeared to be four 4 inch pipe bombs."
>
> 64. The DCSO stopped Raz to investigate the 911 call. Meanwhile, at the request of DCSO, Special Agent Cindy Alexander in the Oklahoma City office of the FBI carried out various investigations via computer on Raz's car, its license plate, and Raz himself. She learned about the call received by the Shreveport FBI office on July 13, 2004, concerning Raz and the vehicle with "four rocket launchers" mounted on its roof. She also learned about the vehicle driven by Raz which contained the United States Postal Inspector Official Business placard and the box of .32 caliber ammunition.
>
> 65. Based on what she had learned, Alexander advised the DCSO that Raz "was of investigative interest to the FBI." She advised the DCSO to follow their usual protocols "with regard to suspicious containers and the report of pipe bombs," and to "exercise extreme caution around Raz until it could be determined what the pipes were and if there were any weapons or explosives within the vehicle."
>
> 66. Alexander also contacted the Tulsa office of the JTTF [Joint Terrorism Task Force] to inform them of the situation. Special Agent James Hight, supervisor of the Tulsa FBI office, requested that the Vinita FBI office respond to the situation in Jay.
>
>     Hight testified that the decision to detain Raz for several hours at the scene of this incident was based on a request of the FBI. When asked why there was any perception of a terrorist threat in the incident, Hight testified that

>   the Department of Homeland Security had law enforcement on a heightened sense of alert during that period of time. Basically, with the fall elections coming up in November, it was believed, which has been widely reported, that based on what happened in Madrid, Spain immediately prior to their national elections, that Al Quada [sic] or other terrorist networks would attempt to stage an attack or attacks to disrupt our national elections.
>
>   On that particular Saturday, there were several high profile events ongoing in Oklahoma, two of which were home football games at Oklahoma State University and the University of Oklahoma at Norman.
>
> 67.   Alexander prepared an Urgent Report to the Director of the FBI about the Jay incident. Its subject was stated to be "Yoram Raz, Possible Terrorist Threat – United States Citizen." This report summarized the relevant information obtained by Alexander in the course of the day's investigatory activities. This document is the last involvement of the FBI with Raz shown by the evidence.

The Memorandum Opinion explains that Plaintiff has lived with his former mother-in-law in Gentry, Arkansas, since June 2005 and had had some contact with local law enforcement. Id. at par. 69. All the FBI agents who were asked whether they were aware of any FBI surveillance of Plaintiff said that there was none. Id. at par. 72.

The conclusions of law note that Plaintiff's claim for intentional infliction of emotional distress was dismissed at the conclusion of his case in chief. Id. at 74.

The Court then considered Plaintiff's claims for invasion of privacy, both in terms of intrusion upon his seclusion and placing him in a false light in the public eye, under the laws of Louisiana, Arkansas and Oklahoma. Id. at pars. 75-79. Judge Hendren found that Plaintiff's claims were without merit, under any theory. Id. at pars. 80-82. Judge Hendren recognized the applicability of the discretionary function exception to the FTCA:

> 80. Regardless of which state's law is applied to Raz's invasion of privacy claims, it is necessary that he prove that the FBI not only invaded his privacy, but also that it violated his constitutional rights. This is because, even under the FTCA, the government may not be sued on a claim that is based on employee action involving an element of judgment or choice – a discretionary function. *Demery v. Department of Interior*, 357 F.3d 830 (8th Cir. 2004).
>
> Neither party disputes that the decision to carry out an investigation involves an element of judgment or choice on the part of the FBI, and therefore Raz's claims based on such decisions and their implementations would be barred by the discretionary function exception unless they involved the violation of a constitutional right. Federal agents do not have discretion to commit constitutional violations. *Raz v. United States*, 343 F.3d 945 (8th Cir. 2003).

Id. at par. 80. Plaintiff was unable to establish the threshold requirement of a constitutional violation. Id. at pars. 81-82. Even if he had done so, the Court found Plaintiff's claims failed because in each instance of contact with Plaintiff, the FBI had demonstrated a compelling governmental interest. Id. at pars. 83-84. Judge Hendren evaluated each incident and found no tortious or constitutional violation of Raz's rights. Id.

In particular, as to the incident on October 2, 2004, Judge Hendren wrote:

> (f) The final FBI investigation occurred on October 2, 2004, and it also involved the car with the cameras on top. It was based on a report of a "suspicious Middle Eastern male" driving a car with "what appeared to be four 4 inch pipe bombs" on top, and occurred during a period of heightened terrorist alert, on a day when there were "several high profile events ongoing in Oklahoma." Raz was again uncooperative with law enforcement [sic] officers.
>
> Under the circumstances, the investigation carried out by the FBI that day was clearly justified by the compelling governmental interest of preventing terrorist activity, and it was carried out in a manner least restrictive of Raz's rights.

Id. at par. 83. Again, as to all FBI activities concerning Plaintiff, the Court found that his invasion of privacy and false light claims failed. Id. at par. 84. As to the latter, the Court found no

> indication that the FBI conveyed any information about Raz to anyone outside of other law enforcement agencies. While the FBI did convey information to other law enforcement agencies, this does not constitute an invasion of privacy. Law enforcement officers are permitted to pool information in carrying out their duties. *See, e.g., U.S. v. Maestas, 2 F.3d 1485, 1493 (10th Cir. 1993), and cases cited therein, and Krohn v. U.S., 742 F.2d 24 (1st Cir. 1084), citing Bartkus v. People of the State of Illinois, 359 U.S. 121 (1959).*

Id.

Under these circumstances, the Court finds Plaintiff's claims are barred by the principles of res judicata. Res judicata and the related doctrine of collateral estoppel are fundamental precepts of common-law adjudication. These precepts hold that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties. *Montana v. United States,* *440 U.S. 147, 152 (1979).* Res judicata is central to the purpose for which the civil courts have been established, namely, the conclusive resolution of disputes within their jurisdictions. *Park Lake Resources LLC v. United States Department of Agriculture,* *378 F.3d 1132, 1135 (10th Cir. 2004).* A party who has had a full opportunity to present a contention in court ordinarily should be denied permission to assert it on some subsequent occasion. Id. This bar protects against the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. Id. See also, *Allen v. McCurry, 449 U.S. 90, 94 (1980).*

Res judicata doctrine encompasses two distinct barriers to repeat litigation: claim preclusion and issue preclusion. *Park Lake, 378 F.3d at 1135.* Claim preclusion bars a party from re-litigating a claim or cause of action on which final judgment has been rendered. Id. at 1136. Claim preclusion applies when:

> (1) There is a final judgment on the merits in an earlier action;
> (2) There is identity of parties or privies in the two suits; and
> (3) There is an identity of the cause of action in both suits.

*Wilkes v. Wyoming Department of Employment, 314 F.3d 501, 503-04 (10th Cir. 2002).* The Tenth Circuit applies the "transactional" approach to the concept of "cause of action";

> Under [the transactional] approach, a cause of
> action includes all claims or legal theories

> of recovery that arise from the same transaction, event or occurrence. All claims arising out of the transaction must therefore be presented in one suit or be barred from subsequent litigation.

Id. at 504. Issue preclusion bars a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim. Id. In general, issue preclusion applies when:

(1) The issue previously decided is identical with the one presented in the action in question;
(2) The prior action has been finally adjudicated on the merits;
(3) The party against whom the doctrine is invoked was a party, or in privity with a party, to the prior litigation; and
(4) The party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Id. See also Estate of H.A. True, Jr. V. C.I.R., 390 F.3d 1210, 1232 (10th Cir. 2004).

In this case, the elements of both claim preclusion and issue preclusion are fulfilled. First, Plaintiff was a party to the lawsuits. Second, the cases were finally adjudicated on the merits, pursuant to Judge Hendren's Opinion of September 2, 2005. Third, Plaintiff had a full and fair opportunity to litigate the issues and claims which he desires to litigate in this case. Indeed, Judge Hendren's Memorandum Opinion and Order made clear that the discovery process in the Arkansas cases was prolonged.

Fourth, in regard to claim preclusion, Plaintiff could have raised any of the claims he has brought before this Court in the Arkansas actions. A review of the Second Amended Complaint for Injunctive Relief in Case No. 02-5184, and two claims in the Complaint in the action for damages, Case No. 02-5193, reveal the incident of October 2, 2004, was not plead as part of the allegations concerning the FBI's wrongdoing. The allegations, however, encompass continuing activities of the FBI, stretching over a span of years and a couple of states. In fact, one of Plaintiff's claims in the Arkansas litigation, as in this case, was intentional infliction of emotional distress. The incident of October 2, 2004, could have been

plead as part of Plaintiff's claims in Arkansas. Moreover, it is clear from Judge Hendren's Opinion that the incident of October 2, 2004, was actually a subject of the trial before him and that it has been fully adjudicated on the merits.

As to issue preclusion, Judge Hendren's Opinion demonstrates the issue of whether the FBI acted wrongfully on October 2, 2004, has been decided by a federal court. The result was negative for Plaintiff.

> Under the circumstances, the investigation carried out by the FBI that day was clearly justified by the compelling governmental interest of preventing terrorist activity, and it was carried out in a manner least restrictive of Raz's rights.

Opinion at 3.

Plaintiff has previously litigated the facts he asserts in the instant case. He cannot re-litigate the claims and issues before a different federal court.

Accordingly, Defendant's Motion to Dismiss is granted.

**IT IS SO ORDERED this 2nd day of July 2007.**

James H. Payne
United States District Judge
Northern District of Oklahoma

14